FALL RIVER SAVINGS BANK; BEN LEE HARRISON & another,[1]
interveners, vs. JOSEPH S. CALLAHAN
(and seven companion cases[2]).

Bristol.  December 16, 1983. — May 1, 1984.

Present: KASS, HALE, & DREBEN, JJ.

*Real Property,* Tax lien. *Negligence,* Attorney. *Attorney at Law,* Approval
of title to real estate, Malpractice. *Damages,* Nominal. *Practice, Civil,*
Trial jury-waived. *Evidence,* Legal malpractice, Professional standards.

An attorney employed by a mortgagee to certify the title to a parcel of land
was liable to the mortgagee and to the mortgagors for negligence in
failing to report the possible existence of a Federal estate tax lien on
the parcel, where title and probate records did not show discharge of
the lien, which had attached to the property automatically upon the death
of a prior owner. [79-80]

An attorney employed by a mortgagee to certify the title to a parcel of land
was liable to the mortgagee and to the mortgagors for negligence in
failing to report the possible existence of a Massachusetts inheritance
tax lien on the parcel, notwithstanding the fact that the administrators'
inventory of a prior owner's estate indicated that no tax was due. [80-81]

Nominal damages were properly assessed against an attorney in an action for
legal malpractice. [81-82]

At the trial of actions against an attorney for negligence in certifying certain
land titles, the judge, as trier of fact, did not err in referring to a treatise
on conveyancing, and to an article published in a legal periodical, to
supplement expert testimony with respect to the standard for lawyers'
competence. [82-83]

Although evidence of the title certification standards adopted by the Massa-
chusetts Conveyancers' Association was improperly admitted at the jury-
waived trial of actions against an attorney for negligence in certifying
certain land titles, the error was harmless, since this evidence was
cumulative of testimony by the parties' expert witnesses and also cumula-
tive of authoritative texts available to the judge. [83-84]

A conveyancer employed by the mortgagee of a parcel of land, who had been
negligent in certifying the title to the parcel, was liable to the mortgagors
for damages resulting from a delay in the mortgagors' subsequent sale
of the parcel. [84]

[1] Donna M. Harrison, his wife.

[2] The seven companion cases were brought by Fall River Savings Bank against
Joseph S. Callahan.

CIVIL ACTIONS commenced in the Superior Court Department, one on January 8, 1979; five on April 26, 1979; one on April 27, 1979; and one on April 30, 1979.

The cases were heard by *Roger J. Donahue*, J.

*John P. Ryan* for the defendant.

*Mary Alice S. McLaughlin* for the plaintiff.

KASS, J. All eight cases, here consolidated for appeal, resulted in findings that the defendant, Joseph S. Callahan, a lawyer, had been negligent in certifying titles as good and marketable without calling to attention that the potential for Federal estate tax liens and State inheritance tax liens had not been eradicated from the record.

We summarize the facts, which we drew from detailed and helpful findings by the trial judge, with some slight supplement from the evidence. See *Kennedy* v. *Kennedy*, 17 Mass. App. Ct. 308, 309 (1983). Fall River Savings Bank (the Bank) hired Mr. Callahan, a specialist in conveyancing, to pass on eight titles to eight parcels of land located in Dighton. The parcels came out of a common chain of title. As to each parcel, Mr. Callahan certified that the property concerned was "free from all record encumbrances, and satisfactory for mortgage purposes," except for listed encumbrances not relevant to this appeal. He further certified that, "In my opinion, the bank is the holder of a good and satisfactory first mortgage [given by the particular borrower in each of the eight instances] . . ."

One of those certifications, given September 5, 1975, concerned a property purchased that day by Ben Lee Harrison and Donna M. Harrison (the interveners) to whom the Bank simultaneously provided mortgage financing. In accordance with G. L. c. 93, § 70, inserted by St. 1972, c. 547, § 1, Mr. Callahan gave a copy of his certification to the Harrisons, as to whom, under the statute, the "certification shall be deemed to have been rendered for the benefit of the mortgagor to the same extent as it is for the mortgagee." When, two and a half years later, the Harrisons undertook to sell their house and land they received unpleasant news. The lawyer who had examined the title for the bank which was to give a mortgage loan to the persons who were buying from the Harrisons report-

ed a title flaw, viz., potential State and Federal tax liens against the property arising out of the death, on July 18, 1971, of Esther Sousa.[3]

The Harrisons took the problem up with the Bank, which sent it down the line to Mr. Callahan with a request that he reexamine the title and take whatever steps were necessary to clear up the Harrison title and the accompanying titles. Mr. Callahan's position was then, and is now, that there was no Federal or State tax due on the estate of Esther Sousa, and therefore, that he had no obligation to do anything about the Harrisons' plight and the Bank's potential difficulties with the other mortgages. If Mr. Callahan was right on the tax questions it should have been a simple matter to obtain releases of lien recordable in form at a price considerably less to all parties than the cost of the litigation which has ensued.[4] As for the Harrisons, they were committed to close on a new house in Taunton, their sale of the Dighton property fell through, and they found themselves in the unenviable position of paying debt service and taxes on two houses.

After a trial without a jury, the judge, as we have noted, ruled that Mr. Callahan was negligent in failing to report the possibilities of tax liens to the bank, and derivatively, to the Harrisons. He also concluded that the Bank was liable to the

---

[3] Esther Sousa died intestate owning a one twenty-fourth interest in land that included all eight parcels at issue in this case. Her heirs and others having an interest in the land conveyed title to Estherbrook Trust on August 15, 1973. The property was then conveyed to Swanset Development Corporation. Swanset, through a nominee corporation, conveyed the eight parcels at issue in this case to individual purchasers who received loans from the Bank.

On August 2, 1971, a petition for the appointment of administrators for Esther Sousa's estate was filed. After the appointment, an inventory was filed on August 15, 1974, consisting of personalty valued at $15,009.42 and real estate valued at $64,050.

As of the time of trial, no final accounting had been filed in Probate Court. See G. L. c. 65, §§ 23 & 24. For the analogous provision under the Massachusetts estate tax see G. L. c. 65C, § 6(b).

[4] Indeed, a lawyer hired by the Harrisons subsequently did so with respect to the State tax lien. What was done to evidence release of any Federal claim, if anything, does not appear definitively in the record.

Harrisons on "the theory of principal and agent."[5] Separate judgments, each for $8,000, were entered in favor of the Harrisons against Mr. Callahan and against the Bank. Satisfaction of either set of judgments would satisfy the other. A further judgment for $8,000 was entered in favor of the Bank against Mr. Callahan. As to the seven certifications other than the one involving the Harrison property, the judge ordered nominal damages of one dollar in favor of the Bank in each case.

1. *The defect.* Mr. Callahan maintains that a reasonable conveyancer would not apprehend or mention potential tax liens concerning the Harrison property[6] because (1) as matter of law there was no Federal tax lien on the property and (2) the mere possibility of a Massachusetts inheritance tax lien need not be mentioned to a client if in fact there is no tax due.[7] If Mr. Callahan's conclusions about the title could be read from the registry or probate record, his position would have some merit. Such might be the case if, as matter of record, the limitations period for a lien had run (see note 8, *infra*). Beyond that sort of incontrovertible record evidence of no tax lien, there is a category of situations where the record lends itself to a reasonable, but not inevitable, deduction that no tax is due. In such cases a workmanlike lawyer would improve the state of the record title by the recording of lien waivers or certificates of no tax due from the appropriate taxing authorities. Johnson, Mechanics of Title Examination in Massachusetts, appearing as appendix to Swaim, Crocker's Notes on Common Forms 585 (7th ed. 1955).

---

[5] The Bank has not appealed from the judgments against it, and we, therefore, do not review them. See *M.L. Shalloo, Inc.* v. *Ricciardi & Sons Constr. Inc.*, 348 Mass. 682, 684 (1965). We intimate no opinion as to the correctness of the determination that the bank is liable for Mr. Callahan's negligence on agency principles. Compare *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 4-8 (1982); *Page* v. *Frazier*, 388 Mass. 55, 66-67 (1983).

[6] The same arguments and answers apply to the other seven parcels.

[7] The inheritance tax was replaced by the Massachusetts estate tax as to persons who died on or after January 1, 1976. See St. 1975, c. 684, §§ 74, 97; *Sachs* v. *Hirshom*, 16 Mass. App. Ct. 704, 705 n.1 (1983).

a. *Federal estate tax lien.* Mr. Callahan concedes that a Federal estate tax lien arose automatically upon the death of Esther Sousa on July 18, 1971, through the provisions of I.R.C. § 6324(a)(1) (1970).[8] See *United States* v. *Vohland,* 675 F.2d 1071, 1074 (9th Cir. 1982) (citing *Detroit Bank* v. *United States,* 317 U.S. 329, 332 [1943]); *Chevron, U.S.A., Inc.* v. *United States,* 705 F.2d 1487, 1491 (9th Cir. 1983). See generally Park, Real Estate Law § 575 (2d ed. 1981). He maintains, however, that, at the time that he certified title to the Bank, the lien had been discharged through the provisions of I.R.C. § 6324(a)(2) (1976), when the property was transferred by the heirs of Esther Sousa to Estherbrook Trust.

Section 6324(a)(2) provides that upon the transfer of *nonprobate* property to a purchaser, the property is divested of the Federal estate tax lien. See Rev. Rul. 69-23, 1961-1 C.B. 302 (1969). See also *United States* v. *Vohland,* 675 F.2d at 1075. The property at issue, however, was part of Esther Sousa's probate estate. Property which is part of the probate estate is divested of the Federal lien upon transfer to a subsequent purchaser only if the estate's fiduciary is discharged from personal liability pursuant to I.R.C. § 2204 (1970). See I.R.C. § 6324(a)(3) (1976), Rev. Rul. 69-23, 1969-1 C.B. 302 (1969). See also *United States* v. *Vohland, supra* at 1075. Since the title and probate records failed to show that the administrators of Esther Sousa's estate had secured a § 2204 discharge — and, if anything, suggested the contrary — the Federal tax lien was facially in effect as of record at the time Callahan certified title to the Bank.

b. *Massachusetts inheritance tax lien.* In the case of the State inheritance tax lien, Callahan reasons as follows: The administrators' inventory of Esther Sousa's estate indicated a total value of $79,059.45. Through the operation of G. L. c. 65, § 1, as amended through St. 1970, c. 566, § 8, the tax is computed on the basis of the value of the beneficiaries' interests. The nine beneficiaries of Esther Sousa's estate were

---

[8] Since this lien was not otherwise discharged, it remained in effect for 10 years. See I.R.C. § 6324(a)(1) (1976).

her children, who, as Class A beneficiaries under G. L. c. 65, § 1, as in effect at the time, were entitled to a tax exemption for property valued at or less than $15,000. Because the estate was valued by the administrators at less than $135,000 (nine children times $15,000), no tax was due.

The most obvious fallacy in Mr. Callahan's argument is that the value of the estate set by an administrator may not be the same as that arrived at by the Inheritance Tax Bureau. See Barrett and Bailey, Taxation §§ 1161 and 1153 (2d ed. 1970). A Massachusetts inheritance tax lien automatically attached to the property in Esther Sousa's estate upon her death, G. L. c. 65, § 1, subject to waiver by the Inheritance Tax Bureau upon its determination that no tax was due. See generally Park, Real Estate Law, *supra* § 443.

Manifestly, the state of the title which Mr. Callahan certified left any subsequent buyer reasonably in doubt whether there might be outstanding claims against the property. The question was not whether taxes were in fact owed but whether it appeared that the title might be subject to an adverse claim which could reasonably be expected to expose the purchasers to controversy and expense to maintain their title. *Smith* v. *Allmon*, 17 Mass. App. Ct. 712, 716 (1984). "It is customary to obtain and file a release of the federal tax lien, and a receipt in full for the Massachusetts inheritance tax." Johnson, Mechanics of Title Examination in Massachusetts, appearing as an appendix to Swaim, Crocker's Notes on Common Forms 585 (7th ed. 1955).[9]

2. *The nominal damages.* Actual loss is an element of the tort of legal malpractice. *McLellan* v. *Fuller*, 226 Mass. 374, 377-378 (1917). Nolan, Tort Law § 187, at 300 (1979). Barry, Legal Malpractice in Massachusetts, 63 Mass.L.Rev. 15, 17 (1978). See generally Meiselman, Attorney Malpractice: Law and Procedure §§ 13.1 and 13.6 (1980). Cf. *Brown* v. *Gerstein*, 17 Mass. App. Ct. 558, 567 (1984). The gist of an action for damages resulting from the negligence of an attorney, however,

---

[9] As to the procedures which govern obtaining releases of the Massachusetts estate tax lien (see note 7, *supra*) see Davis, Massachusetts Conveyancers' Handbook § 117, at 65-70 (1983 Supp.).

"regardless of its form, is the attorney's breach of contract." *Hendrickson* v. *Sears,* 365 Mass. 83, 86 (1974), and cases cited. Mallen & Levit, Legal Malpractice § 605, at 761 (2d ed. 1981). See also Barry, Legal Malpractice in Massachusetts, *supra* at 17. A breach of contract carries with it at least nominal damages, *Nathan* v. *Tremont Storage Warehouse, Inc.,* 328 Mass. 168, 171 (1951), and cases cited. There was no error, therefore, in assessing nominal damages in the seven companion cases. Contrast Wade, The Attorney's Liability for Negligence, 12 Vand. L. Rev. 755, 772 (1959).

3. *Evidentiary matters.* Generally, expert testimony is necessary to establish the standard of care to be expected of a lawyer in particular circumstances. *Glidden* v. *Terranova,* 12 Mass. App. Ct. 597, 598 (1981). *Brown* v. *Gerstein,* 17 Mass. App. Ct. at 566. Each side of the instant case marshalled a parade of experts (three for the Bank and four for Mr. Callahan) who testified as to what, in the circumstances, was good practice. In a certain category of cases tried, as here, to a judge without a jury, the ability of a judge to consult reported opinions, standard texts, and articles in law reviews may lessen the weight, obviate the need for, or supplement expert testimony. This case presents an example of supplementation by such materials. Compare *Glidden* v. *Terranova, supra* at 598, in which, in a case tried to a jury, we observed that expert testimony "is not essential where the claimed legal malpractice is so gross or obvious that laymen can rely on their common knowledge or experience to recognize or infer negligence from the facts."

We touch on this subject because Mr. Callahan argues on appeal that the trial judge erred by employing as guides to decision Davis, Massachusetts Conveyancers' Handbook (2d ed. 1967), and an article by Mr. Roger Tyler appearing in 35 Mass. L. Q. (No. 3) 21, 25 (1950). As we have already noted, we think a judge is generally qualified to evaluate the authoritativeness of legal texts and articles. Their use by lawyers and courts as authority for legal principles is common, as a perusal of any volume of the reports of this court and, indeed, this very opinion, will attest. Use of legal authorities, because of the

special competence of judges to evaluate them, is distinguishable from professional texts in other disciplines considered in cases such as *Framingham* v. *Department of Pub. Util.*, 355 Mass. 138, 145 (1969), and *Mazzaro* v. *Paull*, 372 Mass. 645, 649-652 (1977). See also G. L. c. 233, § 79C.

Of the many areas of law practice, conveyancing is one which lends itself particularly to formulation through decisional law and commentary as to what are appropriate procedures. There may be no definitive rules which prescribe a right or wrong way to conduct a deposition but certain rules have evolved for passing on a title. Thus, reported cases have laid down that it is the duty of conveyancers to notify purchasers that their titles may be subject to contest, even if it appears that resolution of the contest will favor the purchaser-client. See *Jeffries* v. *Jeffries*, 117 Mass. 184, 187 (1875); *Guleserian* v. *Pilgrim Trust Co.*, 331 Mass. 431, 436 (1954); *Smith* v. *Allmon*, 17 Mass. App. Ct. at 715-716. "[C]aution is an indispensible attribute in examining title." Mallen & Levit, Legal Malpractice § 606, at 765. That a potential tax lien raises the prospect of controversy is apparent from cases such as *Sawl* v. *Kwiatkowski*, 349 Mass. 712 (1965), and *Sachs* v. *Hirshom*, 16 Mass. App. Ct. 704, 704-705 (1983). In the narrow range of cases where decisions and commentaries based on decisions establish a standard of lawyers' practice, a court may employ those commentaries in deciding the case. The question has become one which is more of law than fact. See Prosser, Law of Torts 206 (4th ed. 1971).

Mr. Callahan further protests receipt in evidence of title standards adopted and published by the Massachusetts Conveyancers' Association. These were apparently admitted under G. L. c. 233, § 79B, inserted by St. 1947, c. 385, § 1, relating to the admission of "Statements of *facts* of general interest to persons engaged in an occupation . . . ." (emphasis supplied). The title standards are expressions of professional opinion. Cf. *Mazzaro* v. *Paull, supra,* at 652. Compare *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 672-673 (1980). As such, the title standards do not fit within the scope of § 79B, and, if to be used, must be received under § 79C, which involves

procedural preconditions not here complied with.[10] Granting that admission of the title standards under § 79B was error, it was, however, harmless error. There was, as we have noted, expert testimony concerning the standards for dealing with potential tax liens when passing on title to real estate. Authoritative texts were available to the judge. At most, the title standards were cumulative. See *Freedman* v. *Lipman*, 223 Mass. 471, 472 (1916); *Ferris* v. *Turner*, 320 Mass. 555, 558 (1947). *Cormier* v. *Grant*, 14 Mass. App. Ct. 965 (1982).

4. *Mr. Callahan's liability to the Harrisons.* Mr. Callahan contends that his liability on the title certification he gave to the Harrisons conformably with G. L. c. 93, § 70, inserted by St. 1972, c. 547, § 1, expired in September, 1979, when the Harrisons secured a discharge of the mortgage to the Bank. It is sufficient to say that the Harrisons filed their complaint before they succeeded in selling their Dighton house. They had suffered damage incident to the delay in the sale. Moreover, nothing in G. L. c. 93, § 70, as in effect on the date of Mr. Callahan's certification, limited liability of a certifying lawyer in the manner Mr. Callahan urges. Not until the enactment of St. 1979, c. 531, was a limitation of the sort Mr. Callahan presses added to the statute. That act provided that the required certification by a mortgagee's counsel to a mortgagor "shall be effective for the benefit of a mortgagor only as long as said mortgagor owns the . . . premises . . . ."

*Judgments affirmed.*

---

[10] The statute requires that a party intending to offer a statement of facts or opinions give the adverse party or his attorney at least thirty days notice of such intention, with references to the work sufficiently detailed so that the opposing side may study it in advance.