USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-1758 FOCUS INVESTMENT ASSOCIATES, INC., Plaintiff, Appellant, v. AMERICAN TITLE INSURANCE COMPANY, ET AL., Defendants, Appellees. ____________________ No. 92-1766 FOCUS INVESTMENT ASSOCIATES, INC., Plaintiff, Appellee, v. AMERICAN TITLE INSURANCE COMPANY, ET AL., Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Steven E. Snow with whom Partridge, Snow & Hahn was on brief for ______________ _______________________ appellant/cross-appellee Focus Investment Associates, Inc. Max Wistow with whom Stephen P. Sheehan and Wistow & Barylick __________ ___________________ __________________ Inc. were on brief for appellee/cross-appellant American Title ____ Insurance Company. William H. Jestings with whom Patricia A. Buckley and Carroll, ____________________ ____________________ ________ Kelly & Murphy were on brief for appellees Tobak and Abrams & Verri. ______________ Robert S. Bruzzi was on brief for appellee Owen B. Landman. ________________ ____________________ May 11, 1993 ____________________ STAHL, Circuit Judge. In these cross-appeals, we _____________ explore, inter alia, the parameters of a title insurance _____ ____ company's duty to disclose title defects to its insured, a lender-mortgagee. The district court, finding that no such duty existed, granted a post-judgment motion for judgment as a matter of law in favor of defendant American Title Insurance Co. ("American"), thus nullifying a jury verdict awarding $286,000 in negligence damages to plaintiff Focus Investment Associates, Inc. ("Focus").1 Focus appeals that ruling, as well as others related to it. American, meanwhile, argues that the jury's $49,000 damage award on Focus's contract claim may have resulted from erroneous instructions and should therefore be vacated. For the reasons that follow, we affirm the judgments against Focus and vacate the judgment against American.2 ____________________ 1. See generally Focus Inv. Assocs. v. American Title Ins. ___ _________ __________________ ___________________ Co., 797 F. Supp. 109 (D.R.I. 1992). ___ 2. Prior to trial, Fed. R. Civ. P. Rule 50 had already been amended to abolish the different designations between a pre- judgment "motion for directed verdict" and a post-judgment "motion for judgment n.o.v." Both motions are now known as "motions for judgment as a matter of law." As the applicable standards under the two denominations do not differ, we will, for purposes of consistency, refer to the motions at issue as though they were submitted and ruled upon under the amended Rule. See Davet v. Maccarone, 973 F.2d 22, 26 n.4 (1st Cir. ___ _____ _________ 1992) (discussing amendment to federal rule and substituting appropriate nomenclature). -3- 3 I. I. __ Background Facts Background Facts ________________ Unless otherwise indicated, the following facts are undisputed. Focus, a family-owned and operated Ohio corporation, invests money from a family trust and makes loans secured by interests in real estate. On December 6, 1988, Laurence J. Shapiro, a now-deceased Boston-based real estate developer and mortgage broker, contacted Focus President Edward Sarbey3 to solicit placement of a $250,000 short-term loan to George Marderosian, a Rhode Island attorney. Shapiro explained that Marderosian was lead attorney in a real estate enterprise, which urgently needed to fund operational cash shortfalls. Shapiro indicated to Focus that Guardian Mortgage Corp., a loan company Shapiro operated, would make and close the loan, and then assign all loan documents to Focus, in return for Focus's funding and purchase of the loan. Shapiro represented to Focus that the loan would be fully secured by second mortgages on twelve condominium units valued at $1.14 million, subject only to Attleboro Pawtucket Savings Bank's ("Attleboro") first mortgage with an ____________________ 3. Shapiro and Sarbey became acquainted when the two were neighbors in Boston, prior to Sarbey's relocation to Ohio. According to Sarbey, Shapiro originally recommended loans secured by real estate as a safe and profitable investment idea. Prior to the loan here at issue, Shapiro had arranged several other loans for Focus. -4- 4 approximate balance of $720,000. As additional security, Focus was to be given a second mortgage on Marderosian's home, which, according to Shapiro, had an equity value of $100,000 to $150,000 over and above The Boston Five Corp.'s first mortgage. Finally, Shapiro and Marderosian agreed to personally guarantee the loan, and to assign to Focus the proceeds of a consulting agreement between Shapiro and Dean Street Development, a Marderosian client. Based on these representations, Focus agreed to purchase and fund the loan. Shapiro hired defendant James Tobak, an associate of defendant law firm Abrams and Verri, to represent the lender's interests4 and close the loan deal. On December 6, 1988, Tobak transmitted to Sarbey facsimiles of the promissory notes, mortgages, and guarantees executed in connection with the loan. The following day, Tobak informed Sarbey that Focus's mortgages had been recorded and that title insurance had been obtained. He then requested Sarbey to wire the loan proceeds to Abrams and Verri's escrow account, which Sarbey did the same day. The loan closing took place December 8, 1988. The terms of the loan called for an annual interest rate of 20 percent, with monthly ____________________ 4. Focus claims that Tobak was hired to protect its interests, while Tobak claims he was hired to protect Shapiro's and Guardian's interests. We address this dispute- -which turns on the identity of the actual "lender"--more fully infra at 15. _____ -5- 5 interest payments of $4,166.67 to begin on January 6, 1989. Final repayment was due on April 6, 1989. Among the loan documents, Focus received two title insurance policies issued by American's policy-issuing attorney, defendant Owen Landman. The first policy insured Focus's second mortgage on 12 condominium units. The policy showed title to the units to be vested in the name of George A. Marderosian, Trustee of the River's Edge Realty Trust. Excepted from coverage under the first policy was a first mortgage with a principal balance of $720,000. The second policy insured Focus's second mortgage on Marderosian's home, excepting a first mortgage in the principal amount of $150,000. Near the end of December 1988, Shapiro died. In January, February and March 1989, Marderosian made payments to Focus totalling $23,200. However, as of the April 6, 1988, due date, the balance of the principal and the interest due under the terms of the promissory note remained unpaid. In the course of considering its response to Marderosian's non-payment, Focus discovered that its mortgages did not occupy a second position on either of the collateral properties. With respect to the condominium units, Focus's mortgage was in fifth position. Focus's mortgage on Marderosian's home was in fourth position, behind mortgages held by C & K Investments ($100,000) and Bank of New England- -6- 6 Old Colony ($50,000), as well as the first mortgage held by Boston Five Corp. In addition, at the time Focus's mortgage was recorded, title to the condominium units was vested in Capital Center Development, not Marderosian. Neither of the title insurance policies reflected the existence of the senior mortgages nor did the condominium policy reflect the actual ownership. The title insurance policies in question were issued by defendant Landman, whom American had appointed as a policy-issuing attorney in April 1980. Landman, who shared office space with Marderosian, was listed as "Of Counsel" on the Marderosian law firm letterhead. Landman testified that he issued the title policies at Marderosian's request. He conducted no independent title search, but instead relied on Marderosian's representations as to the ownership and mortgage status of the collateral properties. In July 1989, Attleboro foreclosed its mortgage on the condominium units. The foreclosure sale price was $220,000 less than the balance of Attleboro's mortgage, leaving nothing for a second mortgagee. Shortly thereafter, Marderosian's home was bid in at foreclosure by second mortgagee C & K Investments, which assumed liability for the principal balance of $150,000 remaining on Boston Five Corp.'s first mortgage and paid an additional $49,000, for a total purchase price of $199,000. Thus, $49,000 in proceeds -7- 7 remained after satisfaction of the Boston Five Corp. mortgage. On November 11, 1989, Focus filed a diversity action against American, Landman, Tobak, Abrams & Verri, Shapiro's estate, and Marderosian. The nine-count complaint sought damages from American for breach of the title insurance contract, negligence in searching title, negligent hiring, retention and supervision of Landman, negligent misrepresentation of Focus's mortgage position, and bad faith refusal to settle. Focus accused Landman of negligence in searching title and negligent misrepresentation. Tobak and Abrams & Verri were charged with negligent misrepresentation, legal malpractice, breach of contract and breach of fiduciary duty. Finally, Focus sought to enforce the personal guaranties tendered by Shapiro and Marderosian. Prior to trial, Marderosian filed a motion to dismiss, to which Focus did not object, apparently because it thought Marderosian to be judgment-free. The district court granted the motion, with prejudice. At trial, Focus argued that the terms of the title insurance contract obligated American to pay Focus the $49,000 that would have been available to Focus had it actually been the second mortgage holder on Marderosian's home. In addition, Focus sought to recover the loan proceeds, plus costs and interest from defendants American, -8- 8 Landman, Tobak, et al., theorizing that but for their __ ___ tortious conduct, Focus never would have made the loan to Marderosian. At the close of Focus's case-in-chief, American, Landman, Tobak, and Abrams & Verri moved for judgment as a matter of law. The court reserved decision on the motions. The defendants renewed their motions at the close of all the evidence. Focus also moved for judgment as a matter of law on American's affirmative defense of usury. The court denied Focus's motion and reserved decision on the motions of American and Landman. The court granted the motions of Tobak and Abrams & Verri, ruling that Focus's failure to present expert testimony with respect to an attorney's standard of care under the relevant circumstances was fatal to the claim of legal malpractice. The jury found American liable on both contract and negligence grounds, awarding damages of $49,000 and $286,000, respectively. The jury also found Landman negligent, but awarded no damages. Following trial, American moved for judgment as a matter of law on both the contract and negligence counts. The district court, ruling that American owed Focus no duty with respect to the title search, granted the motion on the negligence count, while denying the motion on the contract claim. On June 18, 1992, judgment was entered in accordance with these rulings. -9- 9 Both Focus and American appealed. Focus claims that judgment as a matter of law was improper because American was under a duty to Focus to perform a reasonable title search. Focus also argues that the district court incorrectly ruled that expert testimony was necessary on an attorney's standard of care, and that even if such testimony was required, it was supplied via the testimony of attorneys Tobak and Marderosian. American appeals on the ground that the district court incorrectly charged the jury that it "may" return a verdict for American if it found the loan to Marderosian usurious, when in actuality a finding of usury would mean that a jury "must" rule in favor of American.5 II. II. ___ Focus's Appeal Focus's Appeal ______________ A. Judgment as a Matter of Law A. Judgment as a Matter of Law _______________________________ The bulk of Focus's appeal is aimed at the district court's grant of judgment as a matter of law against Focus on its various claims of negligence. In reviewing a grant of judgment as a matter of law, the evidence and all reasonable ____________________ 5. Focus also argued that American should be held vicariously liable for the negligence of its alleged agent, Landman. The district court ruled that Landman was not American's agent, and Focus appeals that decision as well. The only asserted basis for Landman's negligence was his failure to independently search title prior to issuing the policies in question. Because, as will be explained more fully, infra, we find that a title insurer owes no duty to an _____ insured with respect to a title search, we need not resolve the agency issue. -10- 10 inferences therefrom must be examined in the light most favorable to the nonmovant. Lowe v. Scott, 959 F.2d 323, 337 ____ _____ (1st Cir. 1992). Judgment as a matter of law is appropriate only when the evidence, so viewed, is such that a reasonable jury could reach only one conclusion. Id. ___ B. The Negligence Claims6 B. The Negligence Claims6 ________________________ 1. The Title Search 1. The Title Search ____________________ Focus essentially argues, as it did at trial, that American--via its agent, Landman--failed to conduct a reasonable title search prior to issuing the title insurance policy to Focus. Had American done so, and thereafter disclosed to Focus the correct number of superior mortgages on the proffered collateral, Focus claims it never would have made the loan to Marderosian. At the heart of this argument is the question of whether a title insurance company can be held liable for failure to search title and disclose title defects to its insured. This is apparently an issue of first ____________________ 6. We note that the jury was not given separate instructions relative to each of Focus's negligence claims against American--e.g., searching title, misrepresentation, supervision, etc.--but instead was given a verdict form which asked only, "Do you find American Title liable for negligence in issuing the title insurance policies?" Therefore, because the record does not indicate which theory the jury relied upon to make its $286,000 negligence award, we, like the district court, must examine each theory individually. See ___ Welsh Mfg., Div. Of Textron v. Pinkerton's, 474 A.2d 436, _____________________________ ___________ 441-42 (R.I. 1984) (when multiple theories of liability are submitted to a jury, which then is asked to return a general verdict, each theory must be tested separately to determine whether submission to the jury is appropriate) (citing Davis _____ v. Caldwell, 429 N.E.2d 741, 742 (N.Y. 1981)). ________ -11- 11 impression in Rhode Island, and thus we will seek guidance from, inter alia, analogous decisions of other jurisdictions. _____ ____ See Sainz Gonzalez v. Banco de Santander-Puerto Rico, 932 ___ ______________ ________________________________ F.2d 999, 1001 (1st Cir. 1991) ("A diversity court faced with a paucity of apposite decisional law may look to `analogous decisions . . . and any other reliable data tending to convincingly show how the highest court in the relevant jurisdiction would decide the issue.'")(quoting Redgrave v. ________ Boston Symphony Orchestra, Inc., 855 F.2d 888, 903 (1st Cir. ________________________________ 1988) (en banc)). We review de novo the district court's state law determination. Salve Regina College v. Russell, ____________________ _______ 111 S. Ct. 1217, 1223-25 (1991). It is true, as Focus asserts, that some courts have concluded that a title insurance company may be liable in tort if it negligently fails to discover and disclose a title defect to its insured. See, e.g., Red Lobster Inns of ___ ____ _____________________ America v. Lawyers Title Ins. Corp., 656 F.2d 381, 383 (8th _______ _________________________ Cir. 1981) (applying Arkansas law); Bank of California v. ___________________ First American Title Ins. Co., 826 P.2d 1126, 1128 (Alaska ______________________________ 1992); White v. Western Title Ins. Co., 710 P.2d 309, 315 _____ _______________________ (Cal. 1985); Ford v. Guarantee Abstract & Title Co., 553 ____ _______________________________ P.2d 254, 266 (Kan. 1976); Heyd v. Chicago Title Ins. Co., ____ _______________________ 354 N.W.2d 154, 158 (Neb. 1984). See generally Joyce Dickey ___ _________ Palomar, Title Insurance Companies' Liability for Failure to ____________________________________________________ Search Title and Disclose Record Title, 20 Creighton L. Rev. _______________________________________ -12- 12 455 (1986-87). In each of those cases, however, the title insurance company either had expressly agreed to provide a title report or had issued to the insured a preliminary title report which failed to disclose a title defect which was then excluded from coverage under the policy. In such situations, two distinct responsibilities are assumed [by the insurer]; in rendering the first service, the insurer serves as an abstractor of title and must list all matters of public record regarding the subject property in its preliminary report. When a title insurer breaches its duty to abstract title accurately it may be held liable in tort for all damages proximately caused by such breach. Ford, 553 P.2d at 266 (citations omitted). ____ In the absence of an express contract or preliminary title report, however, courts have uniformly declined to hold a title insurance company liable for a negligent title search. See, e.g., Brown's Tie & Lumber Co. ___ ____ ________________________ v. Chicago Title Co., 764 P.2d 423, 425-27 (Idaho 1988); __________________ Roscoe v. United States Life Title Ins. Co., 734 P.2d 1272, ______ __________________________________ 1274 (N.M. 1987); Grunberger v. Iseson, 429 N.Y.S.2d 209, __________ ______ 210-11 (N.Y. App. Div. 1980); Greenberg v. Stewart Title _________ ______________ Guar. Co., 492 N.W.2d 147 (Wis. 1992); see also Walker Rogge, _________ ___ ____ _____________ Inc. v. Chelsea Title and Guar. Co., 562 A.2d 208, 217-19 ____ _____________________________ (N.J. 1989) (collecting cases). Here, American neither contracted to provide Focus with a title report, nor provided Focus with a preliminary title report. Thus, we agree with the district court that in -13- 13 trying to recover its loan loss under negligence principles, Focus seeks to expand its relationship with American beyond the bounds of the title insurance policy and thereby impose upon American a duty neither undertaken nor imposed by law.7 ____________________ 7. The cover sheet of the policies here at issue states that: SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, AMERICAN TITLE INSURANCE COMPANY . . . insures . . . against loss or damage, not exceeding the amount of insurance stated in Schedule A . . . sustained or incurred by the insured by reason of: 1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein; 2. Any defect in or lien or encumbrance on such title; . . . . 6. The priority of any lien or encumbrance over the lien of the insured mortgage; . . . . Among the relevant Conditions and Stipulations are the following: 6. DETERMINATION AND PAYMENT OF LOSS (a) The liability of [American] under this policy shall in no case exceed the least of: (i) the actual loss of the insured claimant; or (ii) the amount of insurance stated in Schedule A . . . . . . . . -14- 14 See Horn v. Lawyers Title Ins. Co., 557 P.2d 206, 208 (N.M. ___ ____ _______________________ 1976) ("The rights and duties of the parties are fixed by the contract of title insurance.").8 In the absence of a duty to search title, as a matter of law, there can be no liability for failing to do so. See Banks v. Bowen's Landing ___ _____ _______________ Corp., 522 A.2d 1222, 1224-25 (R.I. 1987) (if no duty runs _____ from defendant to plaintiff, an issue which is to be decided by the court, the trier of fact has nothing to consider and judgment as a matter of law must be entered).9 Accordingly, we find that the district court correctly granted judgment as ____________________ 11. LIABILITY LIMITED TO THIS POLICY This instrument together with all endorsements and other instruments, if any, attached hereto by [American] is the entire policy and contract between the insured and [American]. Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or any action asserting such claim, shall be restricted to the provisions and conditions and stipulations of this policy. 8. To the extent that a title insurer searches title prior to issuing a policy, it does so only for its own benefit, to ascertain its risk of liability under the policy as it will except from coverage any title defect it does discover and be liable for damages caused by undiscovered--and unexcepted-- defects. See Greenberg, 492 N.W.2d at 150. ___ _________ 9. To the extent, therefore, that Focus claims that the existence of a duty was a question for the jury, such an argument is legally incorrect. Banks, 522 A.2d at 1225. _____ -15- 15 a matter of law on Focus's claim of negligence in searching title. 2. Negligent Misrepresentation 2. Negligent Misrepresentation _______________________________ As we have said, each of the title insurance policies here at issue excepted from coverage only one prior mortgage, thereby insuring Focus's position as second mortgagee on both the condominium units and Marderosian residence. Focus argues that the policies therefore amounted to a false representation that its mortgages were in second position, which representation was due to American's negligence. Consequently, Focus argues, because it relied on these representations in deciding to make the loan to Marderosian, American is liable for Marderosian's default. Although we agree with the district court that American, as a matter of law, was not liable to Focus for negligent misrepresentation, our reasoning differs somewhat from that of the district court. See Banco Popular de Puerto Rico v. ___ _____________________________ Greenblatt, 964 F.2d 1227, 1230 (1st Cir. 1992) (appellate __________ court can affirm a judgment on any independently sufficient ground reflected in the record). We have stated that "[t]itle insurance is a contract of indemnity, not guarantee." Falmouth Nat. Bank v. __________________ Ticor Title Ins. Co., 920 F.2d 1058, 1062 (1st Cir. 1990) _____________________ (applying Massachusetts law) (citations omitted). Therefore, by issuing a policy, "an insurer does not guarantee the state -16- 16 of the title, but rather, agrees to indemnify the insured for any loss." Id. "Put another way, it is not the mortgage note ___ that is insured, but rather, what is insured is the loss resulting from a defect in the security." Id. (citing ___ Southwest Title Ins. Co. v. Northland Bldg. Corp., 552 S.W.2d ________________________ _____________________ 425, 430 (Tex. 1977)). Moreover, a title insurer "does not guarantee either that the mortgaged premises are worth the amount of the mortgage or that the mortgage debt will be repaid." Blackhawk Prod. Credit Assoc. v. Chicago Title Ins. _____________________________ __________________ Co., 423 N.W.2d 521, 525 (Wis. 1988) (citations omitted). As ___ the title insurance policies issued by American were not representations of title, they cannot, as a matter of law, form the basis of a claim of negligent misrepresentation.10 ____________________ 10. Not only are the district court's decisions regarding the title insurance policies in accord with those of other jurisdictions, they are supported by logic as well. In our view, Focus's position is tantamount to a buyer of life insurance claiming that his policy is a guarantee against death. Focus's claim that it relied on the insurance policies as evidence that no undisclosed superior liens existed simply flies in the face of the fact that the policies were issued to protect Focus against losses it may suffer from undisclosed superior liens. Moreover, an insured's losses are limited to situations where the security of the insured lien is actually impaired by the undisclosed superior lien. "The mere fact of an undisclosed prior lien is insufficient to establish this claim; a showing that the prior lien renders the insured lien `insecure' must be made as well." Blackhawk, 423 N.W.2d at 525-26. (citation _________ omitted). In other words, if the lien held by Focus would have been valueless without the undisclosed lien, Focus cannot claim any loss due to the presence of the undisclosed lien. This explains the jury's $49,000 award under the contract, because between the two collateral properties, only that amount--left over from the foreclosure sale of the Marderosian residence--would have been available to Focus as -17- 17 3. Negligent Hiring, Retention and Supervision 3. Negligent Hiring, Retention and Supervision _______________________________________________ In addition to claims of negligence in searching title and negligent misrepresentation, Focus asserted at trial claims directly against American for negligent hiring, retention and supervision of its policy-issuing attorneys, Landman and Marderosian. The district court found none of these theories to be legally supportable. We agree. Rhode Island law does recognize the direct liability of an employer to third parties for damages caused by employees or agents who were negligently hired, trained or supervised. Welsh Mfg., 474 A.2d at 438. This liability is __________ based on a failure to exercise reasonable care in hiring and retaining a person who the employer knows or should know is unfit for the job, and who therefore exposes third parties to unreasonable risks of harm. Id. at 440. With respect to ___ American's selection and retention of Landman as a policy- ____________________ a second mortgagee. With respect to the rest of the loan to Marderosian, Focus was simply insufficiently collateralized. In making this last statement, we reject Focus's claim that American's negligence resulted in a confused state of title that "chilled" the foreclosure sales and thereby reduced the equity available to a second mortgagee. Although Focus presented expert evidence at trial indicating that the collateral properties had a market value exceeding the foreclosure sale price, those experts testified that although foreclosure itself would reduce a property's market value, they did not consider the effects of a foreclosure sale on the value of the property at issue in arriving at their appraisal. Finally, there was no explanation of how American's alleged negligence--as opposed to Marderosian's actions--created the title confusion, the foreclosure situation or the resulting depressed value. -18- 18 issuing attorney, however, the record is devoid of evidence that American knew or should have known that Landman was unfit for the position. Nor was any evidence presented that Landman exhibited any job-related deficiencies during the nine-year period he served American. Accordingly, we find Focus's negligent hiring and retention claims to be legally insufficient. Focus next argues that American's failure to give Landman personal instructions or training with respect to title insurance or title searching, failure to conduct seminars or courses, and failure to audit Landman's work constituted negligence and resulted in Focus's loss on the Marderosian loan. As we have stated already, however, American was under no duty to provide Focus with a title report, and any title search undertaken by Landman or American was for American's benefit, not Focus's. Thus, any failure on American's part to train Landman is not actionable by Focus. Finally, to support its claim of negligent supervision, Focus argues that if American had a system whereby it could have ascertained which property interests it already insured, it would have discovered the senior liens not disclosed on the policies issued to Focus, since earlier policies on the same properties showed additional different encumbrances. Focus's argument fails, however, because, as -19- 19 American correctly points out, title policies issued at different times may show different encumbrances on the same property simply because the encumbrances may have changed over time due to refinancing or discharge. Therefore, Focus has failed to indicate how such a cross-checking system would have yielded any relevant information. In the end, with respect to all of Focus's negligence claims, Focus received what it bargained for -- a title insurance policy which promised to indemnify Focus for any losses suffered as a result of Focus not having a second mortgage on the relevant collateral properties. As the only equity available to a second mortgagee was $49,000 from the foreclosure of the Marderosian residence, that was the "actual loss" within the meaning of the policy, see supra ___ _____ note 7, and thus the only loss American was required to indemnify. Focus was not legally entitled to anything else from American. C. Legal Malpractice C. Legal Malpractice _____________________ The district court granted judgment as a matter of law in favor of Tobak and Abrams & Verri, holding that Focus needed to present expert testimony to the jury with respect to the duty of care owed by an attorney in Tobak's position. Focus first argues that no such expert testimony was required because the standard of care of an attorney "in representing a lender" is within a layman's common knowledge. In the -20- 20 alternative, Focus argues that the jury was presented with such evidence via the testimony or cross-examination of Tobak, Landman and Marderosian. After careful analysis, we are unpersuaded by Focus's contentions. As an initial matter, we note that in arguing that no expert testimony was required relative to the duty owed by a lender's attorney, Focus has, in our view, misapprehended a ________ critical concern of the district court. In granting Tobak's motion, the court emphasized the confusion surrounding Tobak's actual role in the loan process, and found that Focus's failure to present evidence which would have clearly established Tobak's role was a serious matter, as was its failure to present evidence indicating exactly what is the standard of care for an attorney performing that role.11 ____________________ 11. Specifically, the district court stated: My understanding is that the argument is that Mr. Tobac (sic) allegedly gave an opinion upon which the Plaintiff relied that each of the mortgages in question were second mortgages. There is an underlying factual issue here of whether or not in the first place the defendant, Tobac (sic), and his law firm were engaged for the purpose of providing an opinion with respect to the effect of the two mortgages. I'm satisfied . . . that this is a circumstance in which it's necessary to have available to the jury expert opinion with respect to the duty of an attorney in Mr. Tobac's (sic) situation. Particularly in light of the fact that his situation is unclear to begin with as to just exactly what he was hired to do. What his engagement was. -21- 21 1. The Need for Expert Testimony 1. The Need for Expert Testimony _________________________________ It is well settled under Rhode Island law that a legal malpractice plaintiff must prove the "want of ordinary care and skill" by the defendant. Holmes v. Peck, 1 R.I. ______ ____ 242, 245 (1849). While there is no Rhode Island case law addressing the issue of expert testimony in a legal malpractice case, a review of other jurisdictions indicates that the most widely accepted rule is that a legal malpractice plaintiff must present expert testimony establishing the appropriate standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can resolve the issue as a matter of common knowledge. See generally, Michael A. DiSabatino, Annotation, ___ _________ Admissibility and Necessity of Expert Evidence as to _____________________________________________________________ Standards of Practice and Negligence in Malpractice Action _____________________________________________________________ Against Attorney, 14 A.L.R. 4th 170 (1982) (and cases cited _________________ therein). Cases which fall into the "common knowledge" category are those where the negligence is "clear and palpable," or where no analysis of legal expertise is involved. See e.g., Collins v. Greenstein, 595 P.2d 275 ___ ____ _______ __________ (Haw. 1979) (no expert testimony required for jury to evaluate attorney's failure to file suit within applicable limitations period); Suritz v. Kelner, 155 So. 2d 831 (Fla. ______ ______ Dist. Ct. App. 1963) (no expert testimony required where attorney directed clients not to answer interrogatories even -22- 22 though judge had directed clients to answer on penalty of dismissal), cert. denied, 165 So. 2d 178 (Fla. 1964); Olfe v. _____ ______ ____ Gordon, 286 N.W.2d 573 (Wis. 1980) (no expert testimony ______ required where attorney failed to follow client's instructions because claim was not based on exercise of legal expertise). On the other hand, in cases where legal expertise is an issue, "a jury cannot rationally apply negligence principles to professional conduct absent evidence of what the competent lawyer would have done under similar circumstances . . . " Lenius v. King, 294 N.W.2d 912, 914 ______ ____ (S.D. 1980). See also, Lentino v. Fringe Employee Plans, ___ ____ _______ _______________________ Inc., 611 F.2d 474 (3d Cir. 1979) (where attorney was accused ____ of malpractice for failing to properly advise a pension fund on the tax consequences of a pension plan amendment, expert testimony would be required due to the necessary analysis of the tax code, regulations, and revenue rulings) (applying Pennsylvania law); Willage v. Law Offices of Wallace & _______ ___________________________ Breslow, P.A., 415 So. 2d 767 (Fla. Dist. Ct. App. 1982) ______________ (expert testimony required where malpractice case was based on attorney's failure to call a particular witness, when attorney feared damaging cross-examination of witness). Here, Tobak testified that he was hired by Shapiro and Guardian, together referred to as "the lender," to review loan documents, and in order to do so, he relied on -23- 23 information provided to him by his client. He testified that nothing he reviewed indicated to him that the loan was not proceeding as planned. Sarbey also testified that it was his understanding that Tobak was representing "the lender," but because, in his opinion, Focus was the lender, Sarbey thought that Tobak was representing Focus. Essentially, Focus argues that Tobak was employed by Focus and committed malpractice by relying on the documentation he was presented and simply reviewing it without making an independent investigation. In our view, regardless of who Tobak represented, Focus's claim clearly implicates the issue of Tobak's application of his legal expertise to the situation. Accord, Fall River Sav. ______ ________________ Bank v. Callahan, 463 N.E.2d 555 (Mass. App. Ct. 1984) ____ ________ (approving trial court's use of supplemental sources to augment expert testimony in malpractice trial of title attorney). Accordingly, we find that the district court decided correctly that expert testimony was required to establish the standard of care applicable to an attorney in Tobak's position. 2. Trial Testimony as Expert Testimony 2. Trial Testimony as Expert Testimony _______________________________________ On appeal, Focus asserts that it "adduced the requisite standards of care of a closing attorney, a title attorney, a settlement agent and a fiduciary through the testimony of James Tobak, Owen Landman and George Marderosian." This argument misses the point, and serves to -24- 24 highlight the controversy surrounding Tobak, for Focus has again, as it did before the district court, failed to indicate which role Tobak occupied. Thus, even assuming that the testimony of the three defendants did adduce the claimed standards, the jury could only speculate as to which standard applied to Tobak. See Lenius, 294 N.W.2d at 914 (jury may not ___ ______ be permitted to speculate as to standard of professional conduct). Given the parties' dispute over the employment issue, we believe that the district court correctly concluded that the jury should have been presented with testimony concerning the role assumed by--and concomitant duties of--an attorney in Tobak's position; that is, hired by a party who, on paper, is the lender, but in reality is a broker through whom the loan proceeds will pass. Because Focus failed to clear that hurdle, we need not address the adequacy of the testimony that was introduced at trial. Instead, given the ___ factual and legal landscape, we find that the district court correctly concluded that expert testimony on the nature of Tobak's role was both required and lacking, and therefore properly granted judgment as a matter of law in favor of Tobak and Abrams & Verri.12 ____________________ 12. Focus argues for the first time on appeal that the district court erred because if the jury had found for American on its usury claim, then Tobak would have been liable to Focus for failing to apprise Focus of the illegality. We do not reach this issue, but instead reiterate our familiar position that arguments not raised before the district court "cannot be surfaced for the first -25- 25 III. III. ____ American's Appeal American's Appeal _________________ A. Usury A. Usury _________ Under Rhode Island law, loans which call for annual interest payments in excess of 21 percent are considered usurious, and are therefore void and uncollectible. R.I. Gen. Laws 6-26-2, 6-26-4 (1956) (1992 Reenactment); DeFusco v. Giorgio, 440 A.2d 727, 731-32 (R.I. 1982). The _______ _______ result is the same whether or not the lender intended to make a usurious loan. In re Swartz, 37 B.R. 776 (Bankr. R.I. _____________ 1984). Here, there is no dispute that the promissory note given to Guardian by Marderosian and assigned to Focus provided for 20 percent annual interest. American claims, however, that Shapiro's assignment to Focus of a $56,500 consulting fee paid to Shapiro by Marderosian's client Dean Street Development--an assignment which occurred contemporaneously with the Marderosian loan agreement-- constituted a separate, hidden interest payment on the Marderosian loan, bringing the actual annual interest rate on the loan to 88 percent. According to American's theory, as a result of the usurious--and therefore void--mortgage, Focus failed to acquire an insurable property interest and therefore suffered ____________________ time on appeal." Goldman v. First National Bank of Boston, _______ ______________________________ No. 92-1773, slip op. at 5, n.4 (Feb. 18, 1993). -26- 26 no damage as a result of any title defects. The district court denied Focus's motion for judgment as a matter of law with respect to usury, and allowed the issue to go to the jury, giving the following instruction in the context of the contract claim: Defendant contends that payments under a consulting agreement executed at the same time as the loan agreement were in reality interest payments on the loan. If you find by a preponderance of the evidence that the consulting agreement was really a pretext for the payment of an illegal rate of interest, then you may ___ find that the loan was unlawful and return a verdict for Defendant on the contract claim. (Emphasis added). American timely objected, arguing that the use of the word "may" impermissibly gave the jury discretion to find for Focus even if it found the loan to be usurious. The court did not change the instruction, and the jury awarded Focus $49,000 under the title insurance policy covering the mortgage on Marderosian's home. On appeal, American claims that the "may" instruction was clear and harmful error entitling it to a new trial. After careful review, we agree. Interestingly, Focus does not directly dispute the central thesis of American's appeal--the failure of the jury instruction to conform to the law of usury as it relates to insurable interests. Instead, Focus argues that (1) American, or anyone else other than the borrower, lacks -27- 27 standing to raise the usury defense; (2) American failed to establish a prima facie case of usury; and, (3) it is "obvious" that the jury found that the loan was not usurious, therefore rendering any error harmless. Finding all of Focus's arguments unpersuasive, we address each in turn. 1. Standing 1. Standing ____________ It is ordinarily true, as Focus asserts, that the defense of usury is personal to the borrower or one in privity with the borrower, and unavailable to strangers to the usurious transaction. See generally, 45 Am. Jur. 2d ___ _________ Interest and Usury 288 (1969) (and cases cited therein). ___________________ This custom allows a debtor who does not wish to invoke the protections of usury laws to pay off the debt to which he agreed. See DeFusco, 440 A.2d at 732 (although Rhode Island ___ _______ usury laws manifest strong public policy against usurious transactions, "we do not believe that the Legislature intended thereby to preclude a debtor from waiving a defense of usury under all circumstances"). Focus relies on a host of cases, all of which restate the general proposition stated above. E.g., Securities Exch. Comm'n v. First Sec. Co. of ____ ________________________ __________________ Chicago, 366 F. Supp. 367, 373 (N.D. Ill. 1973); Iamartino v. _______ _________ Avallone, 477 A.2d 124, 128 (Conn. App. Ct. 1984); General ________ _______ Electric Credit Corp. v. Best Refrigerated Express, Inc., 385 _____________________ _______________________________ N.W.2d 81, 83 (Neb. 1986); Pinnix v. Maryland Casualty Co., ______ _____________________ 200 S.E. 874, 879 (N.C. 1939); Benser v. Independent Banks, ______ _________________ -28- 28 735 S.W.2d 566, 569 (Tex. 1987). In each of these cases, however, the party asserting the usury claim was attempting to avoid repayment of a debt, and was prohibited from interposing the claim. See, e.g., Pinnix, 200 S.E. at 879 ___ ____ ______ ("to allow a stranger to interpose the defense of usury to a contract with which the maker is in all respects satisfied, and by the terms of which he desires to abide, and upon which he is liable for a deficiency judgment, would be exceedingly unfair to a debtor who desires to perform his contract. . . ."). Unlike the usury theorists in those cases, however, American is not attempting to step into the shoes of the borrower, Marderosian, and void the loan. Rather than asserting usury as a defense to repayment of the loan, American instead argues that the usurious nature of the Marderosian loan rendered Focus's mortgage interest uninsurable. Indeed, there appears to be no dispute that had Focus not acquiesced to Marderosian's motion to dismiss, Marderosian would have had the right to interpose a usury defense. Thus, while American's claim does implicate the question of usury, Focus's "personal defense" theory--while accurate--is, in our view, misplaced. Accordingly, we turn to the substance of American's argument. "In order for recovery [on an insurance policy] to be had, it is essential that the claimant show both an existing contract of insurance and an insurable interest in -29- 29 the property. No insurable interest existing, the contract is considered absolutely void . . . " 4 John A. Appleman and Jean Appleman, Insurance Law and Practice, 2121 (1969) ____________________________ (footnotes omitted); Cronin v. Vermont Life Ins. Co., 40 A. ______ ______________________ 497 (R.I. 1898). In what is apparently the only case to address the issue, the Minnesota Supreme Court held that a usurious mortgage cannot give rise to an insurable interest. Phalen Park State Bank v. Reeves, 251 N.W.2d 135, 138-39 ________________________ ______ (Minn. 1977). Phalen was a mortgagee's suit on a fire ______ insurance policy. The court accepted the insurance company's argument that the bank, by charging interest on an undisbursed portion of the loan, effectively charged a usurious rate of interest. The Phalen court used two ______ separate analytical paths to reach its conclusion, both of which are applicable here and inevitably lead us to the same determination. First, Phalen restated the general rule that one ______ has an insurable interest in property "by the existence of which he will gain advantage, or by the destruction of which he will suffer a loss." Id. at 139 (quoting Harrison v. ___ _________ Fortlage, 161 U.S. 57, 65 (1896)); see also Appleman, supra, ________ ___ ____ _____ 2123, 2188. Because, however, a usurious mortgage is void, and the mortgagee, therefore, has no right to collect principal or interest, no loss will occur if the property is destroyed. Id. The second rationale employed by ___ -30- 30 Phalen follows from the premise that where a state views a ______ particular legal scheme as reflecting the highest concern for public welfare, strict adherence to that scheme applies, even in collateral matters. Thus, given that the Minnesota Legislature declared usurious transactions to be void, an obvious expression of high public welfare concern, Phalen ______ held that no insurable interest could arise from a usurious mortgage. Id. The Phalen court relied in part on Mackie & ___ ______ ________ Williams Food Stores, Inc. v. Anchor Casualty Co., 216 F.2d __________________________ ___________________ 317 (8th Cir. 1954), a case in which an automobile purchaser failed to comply with statutory conveyancing requirements. Where Missouri's transfer documentation requirement was found to reflect public welfare concern in preventing transfers of stolen automobiles, the court held that the purchaser did not obtain an insurable interest. Id. See also, Cherokee ___ ___ ____ ________ Foundries, Inc. v. Imperial Assurance Co., 219 S.W.2d 203 ________________ _______________________ (Tenn. 1949) (purchaser of real property pursuant to an oral sales contract did not acquire insurable interest because contract was unenforceable under the statute of frauds). Here, under either approach, a finding of usury in the Marderosian-Focus transaction would lead to the inexorable conclusion that the mortgages received by Focus as collateral were not insurable interests. As to the first theory, as we have already noted, usurious transactions are void under Rhode Island law. Thus, if the loan is indeed -31- 31 usurious, Marderosian could legally avoid repayment, and recoup any sums already paid. Cf. Keenan v. Coppa, 195 A. ___ ______ _____ 485 (R.I. 1937). Therefore, because a usurious loan would leave Focus with no enforceable right in the mortgages at issue, a jury finding of usury would necessarily leave Focus with no insurable interest. As to Phalen's second path, the Rhode Island ________ Supreme Court has unequivocally acknowledged that state's strong public policy against usurious transactions. See ___ DeFusco, 440 A.2d at 732. Therefore, if Focus's mortgages _______ were acquired through a usurious transaction, violative of a strong public policy, that public policy would apply to other matters. Under those circumstances, Focus would have no insurable interest. Accord Bankers & Shippers Ins. Co. v. ______ _____________________________ Blackwell, 51 So. 2d 498 (Ala. 1951) (trucking company held _________ to have no insurable interest in freight where carriage contract was illegal). See also, Mackie & Williams, 216 F.2d ___ ____ __________________ at 320; Cherokee Foundries, 219 S.W.2d at 206. Focus ___________________ counters by arguing that Phalen is, by its own terms, limited ______ to its facts, and that a later Minnesota case both distinguished and minimized the importance of Phalen. See ______ ___ Midwest Fed. Sav. and Loan Ass'n v. West Bend Mut. Ins. Co., ________________________________ _______________________ 407 N.W.2d 690 (Minn. Ct. App. 1987). We are unpersuaded. It is true, as Focus points out, that the Phalen ______ majority concluded its opinion by stating: "[W]e stress that -32- 32 our holding has resulted from and is limited to the unique facts and circumstances presented in this case. We do not intend by this decision to depart from the general rule in this state that the defense of usury is personal to the borrower." Id. at 141. Nowhere, however, does Phalen ___ ______ indicate what "unique facts and circumstances" were presented. Irrespective of this qualifying language, however, Phalen's holding remains inescapable--that no ________ insurable interest can arise out of a usurious mortgage. Moreover, as we previously noted, the "general rule" regarding usury is inapposite to this case, where American is not asserting a usury defense, as such. Finally, even if we were to accept Focus's argument concerning Phalen's ________ limitations, we note that Phalen's conclusion with respect to ________ usury was but a small part of a broader inquiry; i.e., whether an insurable interest can arise out of a void or unenforceable contract. The answer generally appears to be negative. See supra pp. 27-29. Nor does Midwest help ___ _____ _______ Focus's cause. In Midwest, the court precluded an insurance _______ company from asserting a usury defense in an action by a mortgagee seeking recovery under a fire policy. Although the court cited Phalen for the "general rule" regarding the ______ personal nature of the usury defense, Id. at 695, the court's ___ decision--and that of the trial court, see id. at 695--was ___ ___ based on a Minnesota statute which precluded all corporations ____________ -33- 33 from invoking a usury defense. Id. Notably, the "insurable ___ interest" aspect of Phalen was never addressed in Midwest, ______ _______ much less limited or distinguished. Finally, to the extent that Midwest can be construed to run counter to Phalen, the _______ ______ latter remains the pronouncement of Minnesota's highest court. Based on the foregoing, we find that American could, under these circumstances, properly raise its usury argument. 2. Prima Facie Case 2. Prima Facie Case ____________________ To support its claim of usury, American argues that Shapiro's assignment of rights under a consulting agreement with Dean Street Development constituted hidden, additional interest, apart from the 20 percent rate charged in the Marderosian loan documents. Under American's theory, the actual interest rate was 88 percent. Focus responds by relying on the apparent separateness between Marderosian and the parties to the consulting fee. Implicitly, the district court rejected Focus's prima facie argument, as it denied its motion for directed verdict on the usury issue. We reject it as well. In short, Focus's argument ignores authority holding that "[u]sury is not determined merely from what the parties represent the transaction to be, but the court will look to the whole transaction, the surrounding circumstances, the occurrences at the time of making the agreement, and the instruments drawn. Whether a transaction legal on its face is, in fact, merely a device to cover -34- 34 usury generally is a question of fact for the jury." 45 Am. Jur. 2d Interest and Usury 112 (1969) (and cases ___________________ cited therein) (footnotes omitted). Here, there is evidence that the loan proceeds were intended for Dean Street Development, a Marderosian client in need of "discreet" funding and there is no question that the assignment from Shapiro to Focus was finalized at the same time as the loan from Focus to Marderosian. Finally, the sum payable under the assignment were due to be repaid April 6, 1989, the same day as the loan. Focus argues that the loan and assignment were entirely separate transactions, characterizing the assignment as nothing more than Shapiro sharing his broker's commission with Focus, a non-usurious transaction. While the jury, of course, is entirely free to accept either version of the facts, it is quite clear that American has at least made out a prima facie case of usury. 3. The Instruction 3. The Instruction ___________________ As the above discussion makes clear, if, in fact, the jury were to find the loan to Marderosian usurious, then, as a matter of law, Focus would have no insurable interest in the collateral mortgages. Therefore, the instruction, which used the permissive "may," allowed for both a finding of ____ usury and a verdict for Focus on its contract claim. This -35- 35 was error.13 Accordingly, American is entitled to a new trial on Focus's contract claim, accompanied by the appropriate instruction on usury. IV. IV. ___ Conclusion Conclusion __________ For the reasons stated herein, the judgment below is vacated insofar as it awarded damages to Focus on its vacated _______ contract claim, and affirmed in all other respects. affirmed ________ ____________________ 13. We find nothing in the record to support Focus's bald assertion that the error was harmless because "it is obvious that the jury found that the loan was not usurious." -36- 36