September 27, 1995

United States Court of Appeals
For the First Circuit



No. 95-1023

FLANDERS & MEDEIROS, INC.,

Plaintiff, Appellee,

v.

ELIZABETH V. BOGOSIAN,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Stahl, Circuit Judge, 
and Dominguez, * District Judge.  



ERRATA SHEET ERRATA SHEET

Please make the following correction:

Page 2, line 5 from bottom of page:

Delete "Woloohojian (now deceased) and Harry
Woloohojian."

Insert "Woloohojian and Harry Woloohojian (now
deceased)."



*Of the District of Puerto Rico, sitting by designation.

United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit


No. 95-1023

FLANDERS & MEDEIROS, INC.,

Plaintiff, Appellee,

v.

ELIZABETH V. BOGOSIAN,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Stahl, Circuit Judge, 
and Dominguez,* District Judge. 



Keven A. McKenna with whom Bruce Hodge was on brief for 
appellant.
Matthew F. Medeiros and Erik Lund with whom Robert Karmen, 
Flanders & Medeiros Inc., Cynthia C. Smith, and Posternak, Blankstein 
& Lund were on brief for appellee. 


September 13, 1995



*Of the District of Puerto Rico, sitting by designation.

STAHL, Circuit Judge. This case arises from the STAHL, Circuit Judge. 

representation of defendant-appellant Elizabeth Bogosian

("Bogosian") by plaintiff-appellee Flanders & Medeiros

("F&M") in hotly contested litigation involving family real-

estate partnerships. After Bogosian failed to endorse over

to F&M checks made payable to Bogosian by the defendant in

the underlying litigation and delivered to F&M as her

counsel, F&M sued Bogosian for breach of contract. Bogosian

counterclaimed for malpractice and breach of the attorney-

client contract. The district court awarded summary judgment

to F&M on all claims. We now reverse the award of summary

judgment on F&M's breach-of-contract claim, and affirm the

district court's ruling on Bogosian's counterclaims.

I. I. 

In November 1989, following the withdrawal of

Bogosian's prior counsel from the underlying litigation, F&M,

a Providence, Rhode Island, law firm, took over the

representation of Bogosian, a citizen of Florida, in the

ongoing lawsuits stemming from her involvement in a family

real estate empire created by her and her two brothers, James

H. Woloohojian and Harry Woloohojian (now deceased).

Bogosian had few liquid assets at the time from which to pay

her lawyers but stood to receive substantial amounts as a

result of her lawsuits. In a letter sent to Bogosian on

November 24, 1989 (the "November 24 letter"), and which

-2- 2

Bogosian then signed indicating her agreement, F&M explained

the terms of its representation. The firm would obtain a

$25,000 retainer from Bogosian, to be deposited in an

interest-bearing account; it would bill Bogosian each month

at its lawyers' hourly rates, with each bill due and payable

within ten days after receipt; and interest would accrue (at

a local bank's prime rate) on bills outstanding for sixty

days or more. The letter further stated:

We recognize that you may be unable to
pay our monthly statements in full on an
ongoing basis. To the extent that you 
are unable to pay those bills from other 
sources, you have agreed to apply your 
first proceeds out of the E & J 
receivership, the Woloohojian Realty 
Associates receivership and/or the 
federal court litigation,[1 ] until all 
of our outstanding bills, including any 
accrued interest, are paid in full. 
Appended to this letter as Exhibit A is
an Assignment that we would ask you to
execute. That assignment gives us an
interest in the proceeds of those court
proceedings up to the amount of our
bills. It is my understanding that you

 

1. The "E & J receivership" and the "Woloohojian Realty
Associates receivership" are state court actions concerning
two family real estate partnerships. The "federal court
litigation" (or "valuation" litigation) was brought by
Bogosian in the United States District Court for the District
of Rhode Island to dissolve the family-owned Woloohojian
Realty Corporation ("WRC"), pursuant to Rhode Island
corporations law. See R.I. Gen. Laws 7-1.1-90. After 
Bogosian filed her lawsuit, WRC exercised its option to buy
out Bogosian's one-third share of the corporation rather than
face dissolution. In April 1995, the district court adopted
as its findings the report of a special master valuing
Bogosian's WRC stock at $4,901,801. See Bogosian v. 
Woloohojian, 882 F. Supp. 258, 261, 266 (D.R.I. 1995).  

-3- 3

have reviewed this agreement with Ted
Pliakas[2] and have found it acceptable.

(emphasis added). The referenced assignment (the "assignment

document") included the following language:

1. Assignee has agreed to represent
Assignor in said actions at hourly rates
set forth in a letter from Assignee to
Assignor dated November 24, 1989.

2. Assignor anticipates that she will 
receive substantial sums in said actions 
(the "Recoveries"), out of which she 
expects and agrees to pay the legal fees 
and out-of-pocket expenses payable to 
Assignee. 

3. To the extent that Assignor owes 
Assignee any money for out-of-pocket 
expenses and legal services rendered by 
Assignee in connection with said actions, 
Assignor hereby assigns to Assignee, 
effective as of the day and year first 
above written, that portion of the 
Recoveries which is necessary to pay all 
of Assignee's then unpaid bills. The 
remainder of the Recoveries shall be
payable to Assignor.

4. In the event that there is a recovery
in fewer than all of said actions, and
Assignee is paid in full, and Assignor
later incurs additional legal expense to
Assignee which is not paid on a current
basis, Assignee shall be paid such
additional legal expense out of
additional amounts, if any, recovered by
Assignor in the remaining actions.

5. Nothing contained herein shall be
construed so as to limit Assignee to
payment of its legal expenses from
amounts recovered by Assignor in said
actions.

 

2. Bogosian's personal attorney.

-4- 4

(emphasis added). Both parties signed the document. F&M

filed an appropriate financing statement with the office of

the Secretary of State, asserting F&M's rights as secured

party to "[a]ll of Debtor's rights to the recoveries received

by Debtor arising from" Bogosian's various lawsuits.

F&M represented Bogosian pursuant to the above

terms in at least ten different matters between late 1989 and

the end of 1992, with the bulk of its time devoted to the

valuation litigation. In July 1990, the district court in

that case ordered WRC (1) to grant Bogosian a $10 million

mortgage on one of WRC's properties as security to guarantee

eventual payment of her shares' value once that value had

been determined, and (2) to provide Bogosian with "interim

distribution" payments of an initial $100,000 plus $10,000

per month, to continue until the entry of a final judgment

determining the fair value of her shares.3

On December 23, 1992, without -- so far as the

record shows -- any solicitation from either Bogosian or F&M,

WRC delivered two checks to F&M made payable to Bogosian.4

 

3. F&M asserted no claim to these payments, presumably
because it had argued to the district court that the payments
were necessary for Bogosian to meet her day-to-day expenses
and demands of other creditors. WRC appealed the district
court's order, and we affirmed. Bogosian v. Woloohojian 
Realty Corp., 923 F.2d 898 (1st Cir. 1991). 

4. The voluntary payment followed on the heels of a jury
verdict in Bogosian's favor in a Massachusetts state court
lawsuit initiated by WRC, in which WRC sought damages in
excess of $20 million for Bogosian's alleged usurpation of

-5- 5

The checks, one for $900,000 and the other for $100,000, were

accompanied by a letter stating the following:

Enclosed please find two (2)
Woloohojian Realty Corp. ("WRC") checks
totalling $1 Million Dollars payable to
Elizabeth V. Bogosian. This sum
represents a voluntary principal payment
made by WRC on account of Mrs. Bogosian's
former shareholder interest. This entire
sum shall constitute an immediate credit
toward any principal sums which may
become due and owing to Mrs. Bogosian in
the federal court proceeding on account
of WRC's purchase of her shares and/or
WRC's liquidation.

WRC, James Woloohojian and the
Estate of Harry Woloohojian remain
willing to negotiate a global settlement
with Mrs. Bogosian which covers all of
the substantive areas detailed in the
offer of settlement dated September 30,
1992 which I sent to Mr. Prentiss. If
Mrs. Bogosian is interested in a global 
settlement, kindly forward her written
counterproposal on or before December 31,
1992. We are prepared to meet
immediately thereafter to negotiate a
final resolution.

Kindly acknowledge your receipt of
this letter and the two checks by signing
and returning the enclosed copy of this
letter. . . .

When WRC delivered the checks to F&M's offices,

Bogosian owed the law firm $999,957 in accrued legal fees,

expenses and interest. F&M contacted Bogosian's attorney

 

corporate opportunities. WRC had previously held out the
prospect of obtaining substantial damages from this and other
lawsuits -- thus offsetting the value of Bogosian's stock in
WRC -- in contesting Bogosian's request for interim
distributions in the valuation litigation.

-6- 6

(Pliakas)5 and asked that Bogosian indorse the two checks

over to F&M pursuant to their assignment agreement. Bogosian

refused, and that same day faxed to F&M the following

handwritten letter:

Please be advised that I do not accept
nor do I authorize the acceptance of a
check from Woloohojian Realty Corp. or
any affiliates as partial payment of any
kind for any purpose.

I have been advised, as your firm has
represented to Judge Boyle, by Eustace T.
Pliakas, Esq., my primary counsel, that a
355 division of the corporation would
have no adverse tax consequences for me 
or WRC and that if his Honor Judge Boyle 
so decides as to effect that result that
it would be very favorable to me.

As you know, WRC has purported that there
will be major tax consequences for the
liquidation of property in order to pay
for my shares which sale Judge Boyle
stated in the last hearing would "never
happen."

If by some means, at the time of Judge
Boyle's final decision, I am forced to
take dollars instead of mortgageable
property, I question whether or not such
principal of tax effecting does not apply
to me. [sic]

In any event I do not wish to prematurely
determine Judge Boyle [sic] final
[unreadable] decision. I will only
accept, as I have requested you pursue,
similar interim relief as I have received
in the past to meet my on going
obligations.

 

5. F&M explained that it contacted Pliakas rather than
Bogosian directly because it recognized that it had a
conflict of interest with Bogosian regarding the checks.

-7- 7

I will not in my present health or
circumstances accept any coercive tactics
or any actions taken which is directed to
creating fear of retribution to myself or
any members of my family.

WRC eventually dropped its requirement that Bogosian

acknowledge in writing receipt of the checks (and possible

acknowledgment that the checks were payments of principal

rather than interest), but Bogosian still refused to indorse

them. F&M and Pliakas discussed over the next couple of

weeks whether the parties could share the money,6 but no

agreement was reached. Thus, on January 14, 1993, F&M

initiated the present action in the district court, alleging

that Bogosian had breached the assignment agreement by

refusing to indorse the checks over to F&M. Bogosian denied

the breach, arguing that the checks were not "proceeds" from

the litigation because neither the court nor she had

authorized such payment, and counterclaimed, alleging legal

malpractice and breach of contract by F&M. Following

discovery, both parties moved for summary judgment. The

district court ruled that F&M was entitled to summary

judgment on all claims, and Bogosian appealed. 

 

6. Bogosian claims that she neither knew of nor approved of
these negotiations, but that Pliakas undertook them on his
own because he feared that F&M's abandonment of Bogosian
could severely harm her position in the ongoing litigations.

-8- 8

II. II. 

A. Standard of Review 

We review a grant of summary judgment de novo, 

reading the record in the light most favorable to the

nonmovant. See, e.g., Byrd v. Ronayne, F.3d (1st 

Cir. 1995). Summary judgment is appropriate if "the

pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).

B. F&M's Breach-of-Contract Claim 

The district court granted F&M summary judgment on

its breach-of-contract claim because the assignment

agreement, the court reasoned, was an "absolute assignment"

of Bogosian's "entire interest in any future proceeds from

those litigations to F&M up to the outstanding amount of the

legal bills. Having so assigned the proceeds, Bogosian had

no power to reject them. She was obligated to indorse the

checks and pay them over to F&M." Flanders & Medeiros, Inc. 

v. Bogosian, 868 F. Supp. 412, 421 (D.R.I. 1994). Whether 

Bogosian had a good faith basis for refusing the checks, the

court held, is "irrelevant." Id. 

The district court's analysis contains a fatal

flaw: It assumes that, because Bogosian assigned her

-9- 9

interest in future litigation proceeds up to the amount of

any outstanding legal bills, she also gave up her right to

reject any offer of partial payment. But the latter

proposition does not necessarily follow from the former; a

litigant may (and often does) assign expected proceeds while

retaining the right to accept or reject any offer of payment

or settlement. None of the cases cited by the district court 

in support of its construction of the assignment agreement --

and subsequently adopted by F&M as authority for its position

in its appellate brief -- stands for the proposition that an

assignment of expected litigation proceeds deprives a

litigant of his or her right to control the terms of

settlement. For example, the court cited Berkowitz v. 

Haigood, 606 A.2d 1157, 1160 (N.J. Super. Ct. Law Div. 1992) 

(holding that assigned proceeds in attorney's trust account

belong to client's assignee and client has no right to

receive them), for the proposition that Bogosian, having

assigned the proceeds, had no power to reject the proffered

checks. But the funds the assignee was claiming in Berkowitz 

were part of a settlement to which Haigood had agreed and 

which had already been paid into his attorney's trust

account. Id. at 1159-60. The court's reliance on Herzog v. 

Irace, 594 A.2d 1106 (Me. 1991), is similarly misplaced. 

That decision's holding that a "client is not entitled to

receive funds once he has assigned them to a third party,"

-10- 10

id. at 1109, is predicated on the client's acceptance of the 

settlement offer from which the funds in question derive, id. 

at 1108. In neither of these cases did the assignee

challenge the assignor-litigant's rejection of an offer of

settlement or partial payment.

Nothing in the assignment agreement purports to

transfer Bogosian's fundamental right to control her own

litigation and accept or reject a settlement offer, whether

in whole or in part. See R.I. Rules of Professional Conduct 

Rule 1.2(a) ("A lawyer shall abide by a client's decision

whether to accept an offer of settlement of a matter.").

Whether a contract that abrogated this axiomatic duty would

even be upheld under Rhode Island law is a question we need

not reach, for the assignment contains no indication

whatsoever that the parties intended such a contract.

Without a clear expression of intent to abrogate a

fundamental rule of the attorney-client relationship, we

would be loath to find such intent. Thus, the assignment of

"recoveries" or "proceeds" by Bogosian to her attorneys

presumes her prior acceptance of a proffered payment. 

Otherwise, the proffered payment remains nothing more than

just that; until it has been accepted by the client or

ordered by the court, it constitutes neither "proceeds" nor

"recoveries" but only an offer of payment or partial

settlement.

-11- 11

Nor does F&M seriously dispute that Bogosian

retained the right to accept or reject any settlement offer.

In fact, F&M concedes in its brief that the assignment

agreement operated as a security agreement, with Bogosian

retaining control over her cause of action, and not as an

absolute assignment of litigation rights:

The agreement did not assign Bogosian's
causes of action to F&M (F&M could not
have sued WRC on those causes of action),
but only assigned the first proceeds from
the litigation; it did not give F&M an
interest in the litigation beyond the
amount of its earned fees and costs.
Moreover, the assignment was not
absolute: it would have been ineffective
if Bogosian had simply paid her bills.7

Brief of Plaintiff-Appellee at 20.8 These concessions 

 

7. A few pages further along in its brief, F&M apparently
decided that it had better argue that the assignment
agreement was in fact an absolute assignment. Responding to
Bogosian's attempt to distinguish In re Apex Oil Co., 975 
F.2d 1365 (8th Cir. 1992) -- which the district court cited
for the proposition that an assignment transfers all rights
in the assigned property -- on the ground that the assignment
in that case was absolute rather than conditional, F&M
informed this Court that "the assignment here was not
conditioned upon anything." Brief of Plaintiff-Appellee at 
28 n.13. We find F&M's first interpretation more convincing.

8. F&M also cited numerous cases as upholding agreements
"such as the one between F&M and Bogosian," Brief of 
Plaintiff-Appellee at 20, all of which construed the 
agreements as security for an attorney's unpaid fees and
expenses rather than as absolute assignments of proceeds.
E.g., Skarecky & Horenstein, P.A. v. 3605 N. 36th St. Co., 
825 P.2d 949, 952 (Ariz. App. 1991); In re Conduct of Taylor, 
878 P.2d 1103, 1110 (Or. 1994); Burk v. Burzynski, 672 P.2d 
419, 423 (Wyo. 1983). Although the language of the
agreements in some of these cases more clearly established
that they were intended to operate as security agreements
than the assignment agreement here, both the November 24

-12- 12

notwithstanding, F&M argues that Bogosian still had no right

to reject WRC's $1 million voluntary payment because it was

not an offer of settlement. At least after WRC dropped the

requirement that Bogosian stipulate that the money would be

applied to principal and not interest, F&M argues, WRC

imposed no conditions on Bogosian's acceptance of the money.

Therefore, so this argument goes, Bogosian could not have had

any valid reason for rejecting the checks.

This argument also misses the mark, for the

proffered payment did in fact contain an implicit condition:

namely, that the $1 million portion of Bogosian's ultimate

award represented by the two checks would be paid in cash and

not property. Bogosian, in accepting the checks, would be

forgoing her right to attempt in the future to structure the

payment of that portion of her award in an advantageous

manner. Thus, while WRC's offer of payment may not have been

a partial "settlement offer" in the usual sense, its

acceptance nevertheless could have limited Bogosian's future

options, and she may well have had legitimate reasons for

refusal.

 

letter and the assignment document limit Bogosian's
assignment of proceeds to the extent that Bogosian has not
paid F&M's bills. Thus, F&M would have no rights to any
proceeds unless and only to the extent that Bogosian fails to
pay her attorney's bills. This is an assignment for purposes
of security. See In re Apex Oil, 975 F.2d at 1369 ("We see 
no meaningful difference between a security interest and an
assignment for purposes of security.").

-13- 13

Moreover, there is evidence that the possibility of

Bogosian ultimately receiving property rather than cash in

exchange for her shares is no pipedream. The statute

governing the valuation litigation provides that, once the

value of Bogosian's shares have been determined, "the court

shall set forth in its order . . . the purchase price and the

time within which the payment shall be made, and may decree 

such other terms and conditions of sale as it determines to 

be appropriate . . . ." R.I. Gen. L. 7-1.1-90.1 (emphasis 

added). The district court in the valuation case recently

stated:

What [Bogosian's] judgment will be
remains to be seen. It may be that the 
court will order satisfaction of the 
purchase price by the transfer of 
particular parcels of real estate, at 
least in part, a result contended for by
Plaintiff. What is clear beyond
peradventure is that it is for this Court
to determine, under the precise terms of
the statute, the "terms and conditions of
sale as it determines appropriate."
Until this Court has had the opportunity
to do so, Plaintiff does not have a
definable interest in any specific
property. There is no judgment for
Plaintiff which may be levied upon.

Bogosian v. Woloohojian, C.A. No. 88-0373B, slip. op. at 7-8 

(D.R.I. Aug. 4, 1995) (emphasis added).

Nevertheless, F&M argues that, even assuming that

Bogosian eventually could receive property instead of cash as 

payment for her shares, she could not have had a good-faith

reason for rejecting the checks because: (1) she would

-14- 14

eventually have to pay the law firm in cash, so even a

disposition of property by the court would necessitate an

eventual sale of assets, and (2) any payments made to F & M

would be tax-deductible, so a cash payment from WRC would not

have any adverse tax consequences. This argument is

similarly unpersuasive: Bogosian could conceivably mortgage

any property she receives and pay F&M from those funds, or

perhaps F&M would even acquire an interest in the property.

And even if a cash payout would be tax-deductible, Bogosian

might prefer a disposition of property for non-tax-related

reasons, e.g., because she believes the property is worth

more than its court-assigned valuation, or because she

believes its appreciation rate and income stream will more

than compensate for interest costs she incurs in mortgaging

it to pay off F&M. In any event, Bogosian asserted in her

faxed response to F&M, on the same day that F&M requested her 

indorsement of the checks, that she did not want to do so in

part to avoid foreclosing the possibility of the district

court awarding her "mortgageable property" instead of cash.

If Bogosian did not in fact reject the checks in

good faith,9 but rather simply because she wanted the cash in

 

9. F&M is correct, of course, in stating that good faith is
not a defense to a breach-of-contract claim. See Restatement 
(Second) of Contracts 11, introductory note (1979). We do 
not hold that a good-faith belief that she did not have to
assign the checks to F&M would absolve Bogosian of liability;
rather, we hold that if Bogosian rejected the checks in good 
faith -- i.e., for some legitimate reason not connected to a

-15- 15

her hands rather than in F&M's coffers, then she may well

have breached the covenant of good faith implicit in all

contracts under Rhode Island law. See Crellin Technologies, 

Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994) 

("Rhode Island recognizes that virtually every contract

contains an implied covenant of good faith and fair dealing

between the parties."); Ide Farm & Stable, Inc. v. Cardi, 297 

A.2d 643, 645 (R.I. 1972) (stating that purpose of implied

covenant of good faith and fair dealing is "so that

contractual objectives may be achieved"). We find, however,

that a rational jury, presented with the evidence contained

in the summary judgment record, could conclude that Bogosian

rejected the checks for a legitimate reason, and therefore

summaryjudgment onF&M'sbreach-of-contractclaim isinappropriate.10

 

desire to keep the money herself and avoid the dictates of
the assignment agreement -- then she has not breached the
contract.

10. A rational jury might also conclude, of course, that
Bogosian only had an aversion to receiving cash when it was
going into F&M's pocket, as counsel for F&M put it at oral
argument. The fact that Pliakas tried to negotiate a share
of the $1 million for Bogosian, and Bogosian's argument to
the district court that F&M should not have asserted a claim
to the money when it knew that she needed the cash to pay
other creditors, support this view. Divining Bogosian's true
intent requires an assessment of her credibility, a task for
the factfinder, not the court.
We have also considered, and found meritless, F&M's
assertion that comments by Bogosian's attorney in a related
interpleader action estops her from arguing now that the
proffered $1 million were not "proceeds." In the course of
arguing against the interpleading of WRC's $1 million,
Bogosian's attorney told the court that the funds were
"proceeds" of the valuation litigation and their disposition

-16- 16

Although we remand for trial on the issue of

liability, we leave intact that part of the district court's

summary judgment ruling establishing the amount Bogosian owed

F&M as of the date of alleged breach, plus interest.

Bogosian argues that this would be inappropriate because F&M

never specifically asked for "partial summary judgment"

pursuant to Fed. R. Civ. P. 56(d). We know of no such

requirement; Rule 56(d) states that a court, "[i]f on motion 

under this rule (Rule 56) judgment is not rendered upon the 

whole case[,] . . . shall if practicable" specify those facts 

that are without substantial controversy. F&M's pleadings

and affidavits made clear that it was asserting that the

legal fees and expenses detailed in its billing statements

were fair and reasonable in light of the services it

performed for Bogosian. Bogosian never contested the

accuracy or truthfulness of any of those statements, nor did

she adduce any expert testimony that the requested fees were

excessive. Bogosian offered her own opinion that the fees

charged for certain portions of the litigation were

 

should be determined in that action. We do not understand
his comments to amount to an assertion of rights by Bogosian
to the money, and we therefore hold that Bogosian is not
estopped from arguing that the funds were not in fact
"proceeds" or "recoveries."

-17- 17

excessive,11 but her generalized assertions are not enough

to create a "substantial controversy" about the amount she is

obligated to pay under her contract with F&M, assuming that

she is found to have breached that contract. See Fed. R. 

Civ. P. 56(e) ("When a motion for summary judgment is made

and supported as provided in this rule, an adverse party may

not rest upon the mere allegations or denials of the adverse

party's pleading, but the adverse party's response, by

affidavits or as otherwise provided in this rule, must set

forth specific facts showing that there is a genuine issue

for trial."); see also Bennett v. Martin-Trigona, 686 F. 

Supp. 6, 9 (D.D.C. 1988) (awarding summary judgment to

plaintiff-attorney after defendant-client failed to provide

evidence of specific errors in bills); cf. Pfeifer v. Sentry 

Ins., 745 F. Supp. 1434, 1443 (E.D. Wis. 1990) (stating that 

when amount of attorney fee is challenged, attorney has

burden of proving reasonableness of fee, but opposing party

has responsibility to state objections with particularity and

clarity).

This is not a fee-award case, where the court is

called on to determine a reasonable attorney's fee in the

 

11. For example, Bogosian asserted that she was billed more
than $200,000 for work concerning her "Section 8
partnerships" yet no lawsuit was ever filed. Bogosian never
bothered to direct us (or the district court) to the specific
billing entries that she claims represent this work, let
alone those entries that she deems excessive.

-18- 18

first instance; it is a contract case, and Bogosian's

obligations to F&M are defined by that contract. See Laverty 

v. Pearlman, 654 A.2d 696, 703 (R.I. 1995) ("[W]hat a 

plaintiff may be bound to pay and what an attorney is free to

collect under a fee agreement are not necessarily measured by

the 'reasonable attorney's fee' that a defendant must pay

pursuant to a court order." (quoting Venegas v. Mitchell, 495 

U.S. 82, 90 (1990)); see also A Sealed Case, 890 F.2d 15, 17 

(7th Cir. 1989) ("Fees are matters of contract, and unless

the fee is so exorbitant that its collection offends

[professional conduct rules], disputes about that are

resolved under that body of law."). A $1 million fee for

extensive work performed in a number of bitterly-fought

lawsuits is not on its face exorbitant, and Bogosian has

utterly failed to provide evidence that any of the claimed

fees and expenses were in fact not incurred, are

unreasonable, or exorbitant. Thus, the amount owed to F&M on

its breach-of-contract claim is not in substantial

controversy and is deemed established upon remand.12

C. Bogosian's Counterclaims 

Bogosian's counterclaim, by the district court's

count, alleged thirty-four instances of malpractice or

breach-of-contract by F&M. Flanders & Medeiros, Inc. v. 

 

12. Subject, of course, to appropriate recalculation of
interest and fees incurred under the contract subsequent to
the district court's summary judgment order.

-19- 19

Bogosian, 868 F. Supp. at 417 n.4 (D.R.I. 1994).13 The 

district court granted F&M summary judgment on each claim

because Bogosian had failed to adduce competent evidence, in

the form of expert testimony, on the standard of care and

scope of duty to which F&M should be held, or on damages.

Id. Bogosian now argues that the district court erred 

because (1) merely identifying an expert witness who would 

 

13. The district court's characterization of the
allegations, with which we largely agree, was as follows:

(a) F&M's failure to obtain sufficient
interim relief in the WRC litigation; (b)
F&M's failure to properly supervise
expert witness Eric Berenson in the
appraisal proceeding before the Special
Master; (c) F&M's failure to insist on
certified income and expense statements
from WRC in the valuation proceeding; (d)
F&M's failure to object to the Special
Master's report on the basis of, inter
alia, the appropriateness of the
comparables relied upon by the Special
Master to arrive at the value of certain
real estate, his valuation of WRC's
management business based upon two years'
management contracts, and the issue of
whether there was a waterway on another
site; (e) F&M's withdrawal of its
representation of Bogosian in the WRC
litigation, and its failure to bring suit
to enjoin Bogosian's brother from
entering into unauthorized management
contracts; (f) F&M's numerous failures to
take action in relation to the two
receiverships; and (g) F&M's failure to
take action to have Bogosian's brother
declared incapacitated and terminated as
a general partner of the Section 8
limited partnerships.

886 F. Supp. at 417 n.4.

-20- 20

testify in support of her claims was enough to survive a

summary judgment motion,14 and (2) certain of her claims

did not require expert testimony.

Bogosian's first argument is plainly wrong. We

stated in Focus Inv. Assocs. v. American Title Ins. Co., 992 

F.2d 1231, 1239 (1st Cir. 1993), that under Rhode Island law,

"a legal malpractice plaintiff must present expert testimony

establishing the appropriate standard of care unless the

attorney's lack of care and skill is so obvious that the

trier of fact can resolve the issue as a matter of common

knowledge." We further explained that claims that "fall into

the 'common knowledge' category are those where the

negligence is 'clear and palpable,' or where no analysis of

legal expertise is involved." Id. Virtually all of 

Bogosian's claims require analysis of legal expertise, and

therefore the mere identification of an expert expected to 

testify at trial would in no way demonstrate the standard of

care applicable to F&M, an essential element of her case.

 

14. Bogosian filed a supplemental response to F&M's
interrogatories identifying an expert witness prepared to
testify on her behalf on February 15, 1994, almost five
months after the September 24, 1993, discovery closure date
and only a week before the summary judgment motions were
argued before a magistrate-judge. The supplemental response
contained no indication of the nature or basis of the
expert's expected testimony other than to say that he would
testify "in support of" Bogosian's defenses and
counterclaims.

-21- 21

Summary judgment is "mandate[d] . . . against a

party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The 

moving party discharges his or her initial burden of

"showing" the absence of a genuine issue concerning any

material fact by pointing out to the district court "that

there is an absence of evidence to support the nonmoving

party's case." Id. at 325. F&M discharged this burden by 

pointing in its summary judgment motion to Bogosian's absence

of expert testimony in support of her counterclaims.15

Therefore, summary judgment was appropriate as to all of her

claims that required the analysis of legal expertise.16

 

15. Bogosian argues that F&M only complained of her failure
to identify an expert witness, and thus she was under no 
obligation to do any more than that. F&M's motion for
summary judgment, however, clearly states that Bogosian "must
present expert testimony" and that she "has no expert
testimony to support this claim." Stating that Bogosian had
not yet even identified an expert witness was simply a
stronger way of stating that she had no hope of bearing her
burden of proof at trial.

16. Bogosian also argues that the district court abused its
discretion in denying her request, pursuant to Fed. R. Civ.
P. 56(f), for more time to produce expert witness affidavits.
She bases this argument on the notion that the requirement
that she adduce expert testimony to survive summary judgment
was a "new rule" dreamed up by the magistrate-judge at the
summary judgment hearing, and that its application to her
case constitutes an abuse of discretion. This argument is
legal poppycock; the requirement of expert testimony in
proving most types of malpractice claims has been so widely
adopted that "it may even be malpractice to litigate a legal

-22- 22

Bogosian also argues that not all of her claims

were of the type that required expert testimony. For

example, she argues that the district court failed to realize

that her allegation that F&M breached its duty of loyalty to

Bogosian when it placed its own interest in getting paid

ahead of Bogosian's possible interest in receiving a property

distribution rather than cash, adequately limned a breach-of-

fiduciary duty claim. Similarly, she argues that her

allegation that F&M withdrew from ongoing litigation in

violation of their contract states a breach-of-contract claim

(assuming that the contract contains an implied term to

continue representation until the conclusion of the

litigation) that is completely distinct from F&M's duty to

perform to the appropriate standard of care. These claims,

Bogosian argues, as well as a smattering of similar

allegations contained in her counterclaim, require no expert

testimony because they do not require the analysis of legal

expertise.

We need not answer the question Bogosian poses,

because even assuming arguendo that Bogosian has adequately 

stated claims that do not require expert testimony, she has 

failed to introduce adequate evidence of damages to support

any of her claims. See 1 Ronald E. Mallen & Jeffrey M. 

 

malpractice case without expert testimony." Wilburn Brewer,
Jr., Expert Witness Testimony in Legal Malpractice Cases, 47 
S.C. L. Rev. 727, 733 (1994). 

-23- 23

Smith, Legal Malpractice 16.1 (1989) ("Since the objective 

of a legal malpractice suit is usually the recovery of

monetary compensation for an injury, pleading and proof of

damages are essential to a cause of action."); cf. Moores v. 

Greenberg, 834 F.2d 1105, 1111 (1st Cir. 1987) ("Whatever 

form a legal malpractice action takes, the plaintiff has the

burden of introducing evidence to justify an award of

consequential damages."). In her Counterclaim, Bogosian

raised the specter of having to hire additional lawyers to

duplicate work already performed by her abandoning lawyers,

yet she never provides further evidence of such costs. In

answering F&M's interrogatories regarding the nature and

scope of her damages, Bogosian repeatedly answered (or

incorporated by reference) that "[a]n expert will assess the

value of damages sustained from Flanders & Medeiros' breach

upon obtaining further discovery." Such an assessment was

never forthcoming. As for F&M's placing its own interest in

getting paid ahead of Bogosian's possible interest in

obtaining a property distribution for the full amount of her

stock's value, the $1 million was never received by F&M, and

the record contains no evidence that the possibility of

Bogosian receiving a distribution entirely in property has

been diminished at all.17 Thus, Bogosian had not adduced

 

17. The checks eventually expired; WRC initiated an
interpleader action in the district court to determine the
rights of various creditors of Bogosian, including F&M, to

-24- 24

competent evidence sufficient to prove an essential element

of her claim, namely, that these alleged breaches by F&M --

whether or not proof thereof would require expert testimony -

- have in fact damaged her. Therefore, summary judgment must

be granted for F&M on these claims.

III. III. 

For the foregoing reasons, the decision of the

district court is reversed in part, affirmed in part, and 

remanded for further proceedings consistent with this 

opinion. 

 

funds WRC expected to pay to her.

-25- 25